## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

JONATHAN E. SHIELDS,    )
             )
  Plaintiff,      )
             )
  vs.         )  **Case number 2:13cv0004 AGF**
             )        **TCM**
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security,  )
             )
  Defendant.      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Jonathan Shields for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b is before the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

### Procedural History

Jonathan Shields (Plaintiff) applied for DIB and SSI in September 2011, alleging he had become disabled on October 27, 2010,[1] by schizophrenia bipolar disorder, social anxiety

---

[1]Prior applications had been denied on October 26, 2010.

disorder, Cluster B personality disorder,[2] attention deficit hyperactivity disorder (ADHD), and chronic obstructive pulmonary disorder (COPD). (R.[3] at 129-43, 158.) His applications were denied initially and following a hearing held in August 2012 before Administrative Law Judge (ALJ) Kevin R. Martin. (Id. at 5-19, 24-75.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and John F. McGowan, Ed.D., testified at the administrative hearing.[4]

Plaintiff, twenty-two years old at the time of the hearing, testified he lives with his wife, mother, and two-week old son in a one-story house. (Id. at 30-31.) His mother pays the rent or mortgage. (Id. at 31.) She receives Social Security disability. (Id. at 32-33.) He is 6 feet tall and weighs 175 pounds. (Id. at 32.)

Plaintiff completed the tenth grade. (Id. at 31.) He does not have a General Equivalency Degree (GED). (Id.)

---

[2]According to the *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. Text Revision 2000) (DSM-IV-TR), personality disorders are grouped into three clusters based on their descriptive similarities. DSM-IV-TR at 685. Cluster B personality disorders include Antisocial, Borderline, Histrionic, and Narcissistic Personality Disorders. Id.

[3]References to "R." are to the administrative record filed by the Commissioner with her answer.

[4]Plaintiff's wife was present at the hearing, but did not testify.

Plaintiff has not looked for work since October 2010.  (<u>Id.</u> at 33.)  His last job was as a part-time fry cook at a Mexican restaurant.  (<u>Id.</u>)  After working there for approximately a year, he walked out after having a break down.  (<u>Id.</u>)  Before that job, he worked full-time as a general laborer for six months.  (<u>Id.</u> at 34.)  This job he also left after having a break down.  (<u>Id.</u>)  And, he has been self-employed doing roofing and siding work.  (<u>Id.</u>)  He stopped this job because he could not handle the stress.  (<u>Id.</u> at 35.)

Asked about his physical problems, Plaintiff responded that he has had COPD for the past two years that makes it hard for him to breathe.  (<u>Id.</u>)  The COPD is worse if he is doing physical work, running, or walking and is better if he sits, relaxes, and catches his breath.  (<u>Id.</u> at 36.)  He has used inhalers – the last time being years earlier – but has had no other treatment because he does not have insurance.  (<u>Id.</u> at 35, 36.)  He could not recall the name of the doctor who had diagnosed him with COPD.  (<u>Id.</u> at 35.)

Asked about his mental problems, Plaintiff responded that he has schizophrenia for which he is still receiving treatment, including taking Zyprexa[5] and being in therapy.  (<u>Id.</u> at 37-38.)  He had been hospitalized for mental problems the year before.  (<u>Id.</u> at 38.)  He hears voices every day for approximately one-fourth of the day.  (<u>Id.</u> at 39.)  This has been occurring for approximately seven years.  (<u>Id.</u>)  He has auditory and visual hallucinations once or twice a week for five to six minutes each time.  (<u>Id.</u>)  The hallucinations distract him.  (<u>Id.</u>)  The more stress he is under, the greater his problems.  (<u>Id.</u>)  Being around people causes

---

[5]Zyprexa is an antipsychotic medication prescribed for the treatment of schizophrenia. <u>Physicians' Desk Reference</u>, 1850 (65th ed. 2011) (<u>PDR</u>).

him stress. (<u>Id.</u>) This also has been occurring for approximately seven years. (<u>Id.</u> at 40.) When he hears the voices, he stops and listens. (<u>Id.</u>) Plaintiff has difficulties when people yell at him or are stern with him. (<u>Id.</u> at 41.) Plaintiff has trouble staying asleep. (<u>Id.</u> at 53-54.) Because he is paranoid, he gets up and checks the doors. (<u>Id.</u> at 54.) His paranoia caused him to get into arguments with people with whom he had worked. (<u>Id.</u>)

Plaintiff has no trouble with dressing himself or with personal care tasks. (<u>Id.</u> at 41-42.) He washes dishes, does the laundry, and mows the yard with a push mower. (<u>Id.</u> at 42, 44, 45.) When mowing the yard, he has to take four or five breaks of approximately ten minutes each. (<u>Id.</u> at 45.) He has difficulties counting money. (<u>Id.</u> at 42.) He was last in a grocery store seven months earlier. (<u>Id.</u>) There are "[t]oo many people" in a store. (<u>Id.</u>) The last time he was in a store, he started to have a panic attack. (<u>Id.</u> at 43.) When he has an attack, his heart rate increases, he gets shaky, and he has difficulty breathing. (<u>Id.</u>) This happens when he is out in public. (<u>Id.</u>) He used to take Ativan[6] for the problem, but stopped several months earlier because he can no longer afford it. (<u>Id.</u> at 43-44.) Plaintiff has three dogs and a cat as pets. (<u>Id.</u> at 45.) He does not walk the dogs. (<u>Id.</u>) Once a month, he goes fishing, usually by himself. (<u>Id.</u> at 45-46.) He changes his son's diapers. (<u>Id.</u> at 46.) He has friends who visit him approximately once a week to sit around and talk. (<u>Id.</u>) He has lost friends because of his anxiety. (<u>Id.</u> at 51.) He does not belong to any social organizations, attend church, or use the computer. (<u>Id.</u> at 47.) He no longer plays video games because his

---

[6]Ativan is a benzodiazepine used to treat anxiety disorders. <u>See</u> <u>Ativan</u>, <u>http://www.drugs.com/ativan.html</u> (last visited Jan. 24, 2014).

game system recently broke.  (Id.)  When he was playing video games, he had difficulties concentrating and could not play for longer than thirty minutes at a time.  (Id. at 52.)  He seldom goes out to eat, and has not ate in a restaurant for approximately one year.  (Id. at 47.)

Plaintiff testified he spends most of his day sitting and watching a movie or show.  (Id. at 48.)  He gets out of the house and walks around the block once or twice a week.  (Id. at 48.)

Plaintiff smokes approximately one pack of cigarettes a day.  (Id. at 48-49.)  He does not drink alcohol.  (Id. at 49.)  He no longer uses illegal drugs, having last used marijuana the previous February or March and last used methamphetamine several years earlier.  (Id.)  He has taken Vicodin[7] that was not prescribed for him; this was last year.  (Id. at 50.)

Plaintiff further testified that his wife helps keep him calm.  (Id. at 53.)

When he was young, Plaintiff was in foster care and had been sexually abused.  (Id.)  He still occasionally thinks of the abuse.  (Id.)

Plaintiff's medications make him sleepy.  (Id. at 54.)  Although he takes them at night, he still feels tired when he wakes up in the morning.  (Id.)  Some days it is harder for him to do things than other days.  (Id. at 55.)  He has no motivation.  (Id.)  At least once a month, he has a bout of depression that lasts for a day or two.  (Id.)  When this happens, he lies in bed and feels suicidal.  (Id.)

---

[7]Vicodin is a combination of hydrocodone, an opioid analgesic, and acetaminophen.  PDR at 573.  It is prescribed for the relief of moderate to moderately severe pain.  Id.

Dr. McGowan, testifying without objection as a vocational expert (VE), was asked to assume a hypothetical claimant of Plaintiff's age, education, and work experience who can perform the full range of work with no exertional limitations but who is able to only understand, remember, and carry out simple instructions; who is limited to occasional interaction with co-workers and supervisors and no more than incidental interaction with the public; and who can adapt when necessary to changes common to a competitive work setting but will need to be introduced to those changes gradually. (Id. at 57, 59.) This claimant can maintain adequate attendance and sustain an ordinary routine without special supervision. (Id. at 59.) He replied that this claimant can not perform Plaintiff's past relevant work but can perform such jobs as janitorial work, a warehouse packer, and landscaping or grounds keeping jobs. (Id. at 60-61.)

If this hypothetical claimant also needs to avoid concentrated exposure to hazards such as moving machinery and unprotected heights and to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation, the jobs of janitor in an industrial setting, landscaping, and grounds keeping would be eliminated, but the job of warehouse packer would not be. (Id. at 61-62.) Also appropriate are jobs of order filler, laborer in stores, and linen room attendant. (Id. at 62-63.) The cited jobs are at the medium exertional level. (Id.) Appropriate jobs at the light exertional level include bench assembler and electronic assembler. (Id. at 64.)

If the hypothetical claimant is off task for approximately one-fifth of the work day, none of the jobs are appropriate. (Id.) Nor will any jobs be appropriate if the claimant needs

to be away from the work station each day for more than two twenty-minute breaks and the lunch hour or if the claimant will miss two or more days of work each month because of their symptoms.  (<u>Id.</u> at 65.)

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and various assessments of his mental capabilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (<u>Id.</u> at 157-65.)  He stopped working because of his impairments, see pages one to two, supra, on September 30, 2010.  (<u>Id.</u> at 158.)  The highest grade he completed was the tenth grade; he had not been in special education classes. (<u>Id.</u> at 159.)  The job he had held the longest was for fourteen months and was as a head preparation cook.  (<u>Id.</u>)  He had worked at this job five days a week for six hours each day.  (<u>Id.</u>)  His other jobs were as a laborer or enumerator. (<u>Id.</u>)  Plaintiff was hospitalized for three days in June 2011 after he attempted to commit suicide by an overdose.  (<u>Id.</u> at 162.)

On a Function Report, Plaintiff described his daily activities as showering, getting dressed, picking up the house, doing the dishes, running any necessary errands, and sitting or visiting with family before going to bed.  (<u>Id.</u> at 182.)  He does not take care of anyone else, but does feed, water, and occasionally bathe his pets.  (<u>Id.</u> at 183.)  Before his impairments, he could engage in such physical activities as running without becoming short of breath and could be in public groups.  (<u>Id.</u>)  His impairments affect his sleep by making

it hard for him to fall and stay asleep.  (Id.)  He does not have any problem with personal care tasks.  (Id.)  He does not need any reminders to take his medications.  (Id. at 184.)  He prepares simple meals every day.  (Id.)  He goes outside every day and can go out alone if he does not have to be around other people.  (Id. at 185.)  He shops for food once a week for approximately twenty minutes.  (Id.)  He can count change, handle a savings account, and use a checkbook.  (Id.)  Because of his impairments, however, he loses count or gets confused when handling money.  (Id. at 186.)  His hobbies include watching television, listening to music, and playing video games.  (Id.)  He does not spend time with other people, and "get[s] extremely anxious around people, especially large groups."  (Id. at 186, 187.)  His impairments adversely affect his abilities to walk, kneel, climb stairs, complete tasks, understand, and get along with others.  (Id. at 187.)  They do not affect his abilities to, inter alia, remember and concentrate.  (Id.)  He can walk for no longer than ten minutes before needing to rest for five minutes.  (Id.)  He cannot pay attention for longer than ten minutes. (Id.)  He follows written instructions "with some difficulty," but can follow short spoken instructions.  (Id.)  He does not get along well with authority figures because he does not respond well to intimidation.  (Id. at 188.)  He does not handle stress or changes in routine well.  (Id.)  He is furious when he is mad and depressed when he is sad.  (Id.)  He is afraid he will be framed by everyone.  (Id.)

    Plaintiff's wife completed a Function Report on his behalf.  (Id. at 166-73.)  Her responses varied from him only in that she reported his impairments did not adversely affect his sleep; he visits with family or friends and goes to stores three to four times a week; and

he can follow written and spoken instructions well, although he sometimes has to double check the spoken instructions. (Id. at 167, 170, 171.) On the list of abilities adversely affected by his impairments, she circled only "understand" and "get along with others." (Id. at 171.) He can walk for only eight blocks before having to stop and rest for five to ten minutes. (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications. (Id. at 193-98.) His impairments have gotten worse since he filed the original report; his doctor has increased the dose of one medication and added another. (Id. at 193.) He is having increased mood swings and anger. (Id.)

The medical records are summarized below in chronological order and begin with those of the Moberly Regional Medical Center (MRMC) when Plaintiff went to the emergency room in January 2011 with complaints of a fever that had begun three days earlier and was accompanied by vomiting, a sore throat, myalgias, and congestion. (Id. at 213-31.) He was not in respiratory distress, had a normal affect, and was alert and oriented to person, place, and time. (Id. at 214.) He was diagnosed with acute pharyngitis, prescribed penicillin, instructed to follow up with Jon Rampton, D.O., in ten days, and discharged. (Id. at 215, 226.)

Plaintiff was seen again at the MRMC emergency room on June 19 after he intentionally took an overdose of pills. (Id. at 201-212, 232, 293-307.) He was homicidal and suicidal, threatening to cut everyone's throat and to take as many pills as he wanted. (Id. at 201, 207.) He refused to have his blood drawn and stated he was a recovering heroin

addict and as such wanted to take more drugs.  (Id. at 201.)  Plaintiff was placed in four point restraints, given intravenous anesthesia, and admitted to the hospital.  (Id. at 202, 208, 213, 233-67.)  A urine drug screen was positive for marijuana and opiates.  (Id. at 242, 252.)  The attending physician, Singh Rachandeep, M.D., noted that, according to the emergency room physician and nurses who knew Plaintiff from a previous admission, Plaintiff had a history of drug abuse.  (Id. at 244.)  Plaintiff was discharged to the Sheriff's Department the next day for an involuntary inpatient evaluation at the University of Missouri – Columbia Hospital (UMCH).  (Id. at 242-43, 273-80, 289, 308-14.)  In support of the order requiring the evaluation, his wife completed a statement averring that Plaintiff had said he wanted to sleep because he thought she had left him.  (Id. at 286.)  His mother averred that Plaintiff had been increasingly volatile and angry during the past few weeks.  (Id. at 287.)  The admitting history referred to Plaintiff taking the pills after getting into an argument with his wife about a computer.  (Id. at 309.)

After one day of in-patient treatment, including being given Ativan, Plaintiff's mood and behavior had improved to the point where he was no longer considered to be a danger to himself or others.  (Id. at 289, 312.)  The following notation was entered in his records on June 21:

> Mood is sleepy.  Sleeps 8 hours and has no problems.  Maintains interest in fishing. Denies guilt or hopelessness. Energy is decreased. Concentration and appetite are okay. Psychomotor agitation. He denies mania. Endorses anxiety "with random triggers."  He says he has rare panic attacks, the last one was a couple months ago.  Endorses PTSD symptoms of flashbacks and avoidance but does not want to talk about it. Denies OCD. Endorses occasional auditory or visual hallucinations of hearing screaming voices with commands that tell him to hurt himself and others but he never listens to them.  He also endorses

> paranoia of not being able to trust others. Denies ideas of reference or special
> powers. Denies any self-mutilation behaviors. He has a history of aggression
> towards others and says he will lash out in defense.

(Id. at 310.) He was not currently in therapy and was not taking any medication. (Id.) He

daily smoked eight cigarettes and marijuana. (Id. at 311.) He was a recovered heroin addict.

(Id.) His highest education level was the eleventh grade. (Id.) He was discharged home.

(Id. at 289, 312.) His psychiatric diagnoses were adjustment disorder with anxious and

depressed mood and mood disorder, not otherwise specified. (Id. at 312.) His Global

Assessment of Functioning on discharge was 55.[8] (Id. at 313.) He was given a prescription

for Vistaril for anxiety and the phone number for Burrell Behavioral Health (Burrell) to call

for psychiatry and therapy appointments. (Id.)

Plaintiff returned to UMCH the next day. (Id. at 318-36.) He explained that he had

slept for eight hours after being discharged the day before. (Id. at 319, 326.) When he woke

up, he became concerned after his wife explained what had happened during the past few

days. (Id.) He reported having been depressed for several days because he was unable to get

a job, had financial problems, was concerned about his mother's health, and was worried

about not having had a child. (Id.) He had had "severe anger issues since he was a child,"

getting angry about small things and having difficulty calming down when angry. (Id. at 319,

---

[8]"According to the [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the
individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir.
2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621
F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates "[m]oderate symptoms
(e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-
TR at 34 (emphasis omitted).

326.)  He had had several physical altercations when angry and was not always remorseful about his actions.  (Id. at 319, 326-27.)  He had been hearing voices for the past five to six years, both male and female, that told him to kill himself and others.  (Id. at 319, 327.)  He thought others were trying to harm him.  (Id.)  He self-medicated with other people's Klonopin[9] and with marijuana.  (Id.)  His urine was positive for marijuana.  (Id. at 320.)

Plaintiff's mood and affect quickly stabilized after he was given various medications, including Ativan, hydroxyzine, and Haldol.[10]  (Id.)  He did not report having any hallucinations when hospitalized and did not appear to be responding to internal stimuli.  (Id.)  He was not aggressive or threatening.  (Id.)  He was discharged on June 24.  (Id. at 321.)  No medication was prescribed at discharge, but he was to follow up with Burrell in four days.  (Id.)  On discharge, he was alert, oriented, and cooperative.  (Id.)  His mood was fine; his thoughts were goal-directed; his affect was congruent and stable; his perception was normal; his eye contact, insight, and judgment were fair.  (Id.)  His discharge diagnoses included cannabis dependence; amphetamine dependence; sedative/hypnotic on anxiolytic abuse; Cluster B personality disorder; and hypercholesterolemia.  (Id. at 318.)  His GAF, which had been 35[11] on admission, was 55.  (Id.)

_____

[9]Klonopin (clonazepam) is a benzodiazepine used to treat seizure disorder or panic disorder. See Klonopin, http://www.drugs.com/klonopin.html (last visited Jan. 24, 2014).  Klonopin was one of the medications Plaintiff took when overdosing in June.

[10]Haldol is an antipsychotic medication used in the treatment of schizophrenia.  Haldol, http://www.drugs.com/mtm/haldol.html (last visited Jan. 24, 2014).

[11]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff saw Kristin Parkinson, M.D., with Burrell on August 8. (<u>Id.</u> at 342-45.) Plaintiff reported he can not make any decision, even what to order at McDonald's, because voices in his head question everything he does. (<u>Id.</u> at 342.) Also, he has always had anger issues. (<u>Id.</u>) Anything can trigger his anger. (<u>Id.</u>) He tries to avoid people. (<u>Id.</u>) If he does not smoke marijuana, he cannot sleep, will not eat, and is mean. (<u>Id.</u>) He is very anxious and always worries. (<u>Id.</u> at 343.) He cannot hold a job because of his anxiety and anger. (<u>Id.</u>) He does good work until he gets upset and "blows up." (<u>Id.</u>) On examination, he was alert and oriented, in no acute distress, and was "a little anxious." (<u>Id.</u> at 344.) He was cooperative. (<u>Id.</u>) His flow of thought was logical and goal-directed; his speech was regular in rate, rhythm, and volume. (<u>Id.</u>) He reported having auditory hallucinations. (<u>Id.</u>) Dr. Parkinson diagnosed him with schizophrenia, undifferentiated; intermittent explosive disorder, provisional; polysubstance dependence; and cannabis dependence. (<u>Id.</u> at 344.) His GAF was then 51. (<u>Id.</u> at 345.) She prescribed a trial of Zyprexa and continued him on Vistaril. (<u>Id.</u>)

Three weeks later, Plaintiff underwent a comprehensive clinical assessment at Burrell. (<u>Id.</u> at 346-60.) His current symptoms were described as follows:

> [Plaintiff] reports he feels anxious all of the time, his heart races, on edge around large groups of people. Irritible [sic], easily snaps, describes getting to a certain point and then he will snap, when he does he yells, fights.
>
> Reports he is depressed "sometimes." Severe mood swings.
>
> He has been hearing voices since adolesence [sic], continues to hear whispers. He has noticed an improvement in symptoms since starting medications three weeks ago.

(Id. at 346.)  He was experiencing significant stress due to his mother's poor health and to financial problems.  (Id.)  Plaintiff reported he had had psychiatric treatment when he was fourteen years old and had been prescribed Prozac.[12]  (Id. at 348.)  He had stopped taking the medication.  (Id.)  He had a history of abuse of marijuana, hashish, and tetrahydrocannabinol (THC).  (Id.)  He briefly used heroin beginning when he was fourteen.  (Id. at 349.)  He still used marijuana.  (Id.)  The last grade he completed was the tenth grade.  (Id. at 350.)  He dropped out of school in the eleventh grade because he was selling drugs.  (Id.)  He was described as "very intelligent," and had high test scores.  (Id.)  He had been in foster care as a child and been sexually abused by three other boys.  (Id. at 351.)  He had later lived with his father, who had physically and emotionally abused him.  (Id.)  He was "[u]nable to maintain employment due to volatility, irribility [sic], anger, and mood swings."  (Id. at 353.)  He did "not work well with authority figures."  (Id.)

Plaintiff saw Justin Blount, M.D., a psychiatrist at Burrell, on September 9.  (Id. at 340-41, 395.)  He reported that he had been helping to tear off his friend's roof.  (Id. at 341.)  The medications were helping.  (Id.)  He was not as irritable or angry.  (Id.)  He was sleeping better.  (Id.)  With the exception of marijuana – which he refused to stop using – he was not using drugs.  (Id.)  He had been doing some housework.  (Id.)  On examination, he was alert, "somewhat cooperative," and had a decent mood, congruent affect, regular rate and rhythm of speech, and ordered thoughts.  (Id.)  He denied having any hallucinations, auditory or

---

[12]Prozac is prescribed for the treatment of major depressive disorder.  PDR at 1816.

visual, and any suicidal or homicidal ideation. (Id.) He was continued on his current medications and was to return in two months. (Id.)

Plaintiff returned on October 21, reporting that he had been having a lot of problems with anxiety and that Vistaril was not helping. (Id. at 396.) He had stopped smoking marijuana. (Id.) He was isolating himself more and would not leave the house without his wife. (Id.) His anger was better; "[t]hings were not getting to him like they were." (Id.) He was still hearing some whispers and was using coping skills. (Id.) He reported he had been diagnosed with ADHD when a child and had taken Adderall. (Id.) On examination, he was alert and anxious and had a blunted affect. (Id.) His thoughts were ordered. (Id.) He was continued on the Zyprexa and Vistaril and was prescribed Ativan to be taken as needed for anxiety. (Id.) He was to return in two months. (Id.)

In December, Plaintiff told Dr. Blount that he was "[h]aving a hard time." (Id.) He had not been truthful with the clinic. (Id.) He had been having "[l]ots of mood lability, extreme anger and crying." (Id.) He had been hearing whispers and foot steps and seeing a human shadow walking across the room. (Id.) He was having difficulty leaving the house, and was destroying furniture. (Id.) When depressed, he thought "of taking a bunch of pills." (Id.) This expression was not of a plan or intent, but was indicative of the degree of his depression. (Id.) He was not using illegal drugs. (Id.) He was prescribed Zyprexa, Celexa,[13] and Ativan and was to return the next month. (Id.)

---

[13]Celexa (citalopram) is used in the treatment of depression. Celexa, http://www.drugs.com/celexa.html (last visited Jan. 24, 2014).

He returned in two months, in February 2012.  (Id. at 398-99, 403-04.)  He had been crying and getting more depressed.  (Id. at 398.)  He had not been getting angry or been breaking things.  (Id.)  He could not go out in public, even to see his father-in-law next door. (Id.)  He was afraid of rejection.  (Id.)  He continued to hear things.  (Id.)  He was no longer tempted to take pills.  (Id.)  He was in therapy.  (Id.)  On examination, he was alert and depressed and had a blunted affect, ordered thoughts, regular rate and rhythm of speech, auditory hallucinations of hearing whispers, and visual hallucinations of seeing shadows. (Id.)  He was continued on his medications.  (Id.)

Stephanie Frasier, a community support specialist with Burrell, met with Plaintiff at his house in March to encourage him "to accompany [her] into the community."  (Id. at 405.) He was in a good mood, but refused to go into the community with her.  (Id.)  In April, she met Plaintiff at his house to accompany him to his appointment with Dr. Blount.  (Id. at 406.) She noted that he was in a good mood, but continued to refuse to go into the community. (Id.)  Dr. Blount noted Plaintiff's description of his mood as being "'alright.'"  (Id. at 407.) Plaintiff reported he heard voices when out in public.  (Id.)  He heard someone on his porch in the evening or at night.  (Id.)  He was not getting angry or breaking things and was not seeing shadows or smoke very often.  (Id.)  He was consistently taking his medications, which were helpful and which were again prescribed.  (Id.)

Later in April, Ms. Frasier met with Plaintiff at his house "to ensure medication management and engage in conversation regarding moving to the maintenance program."  (Id. at 408.)  Plaintiff was in a good mood.  (Id.)  Plaintiff was moved to the maintenance program

because he was not willing to work on his anxiety issues and was resistant to entering the community.  (Id. at 409.)  He was described as "function[ing] well in all other areas."  (Id.)  He kept his appointments with Dr. Blount, was compliant with his medications, had good hygiene, and took care of his personal needs.  (Id.)

In June, he was contacted by telephone by Janet Schnetzler with Burrell as a matter of routine to inquire about his mood and medication compliance.  (Id. at 410.)  He reported he was "doing okay" and his mood was "'alright.'"  (Id.)  He answered her questions with a "yes," "no," or very short response.  (Id.)  He had been taking the Zyprexa, but could not afford the Ativan and Celexa.  (Id.)  He had been getting upset or mad "every once in awhile," but had not been having major outbursts.  (Id.)  He spent most of his time at home and did not like being around people.  (Id.)

Later in June, Plaintiff saw Andrea Earlywine, A.P.N. (Advanced Practice Nurse), with Burrell.  (Id. at 411-12.)  He explained he had not been taking the Ativan or Celexa because he could not afford the monthly $30 costs; she explained that the Celexa was $4 a month when filled at large pharmacies.  (Id. at 411.)  He reported he had been "'pretty much in a good mood all the time" when taking Celexa, but "'not so much'" when not.  (Id.)  He felt "a little depressed and a little agitated.."  (Id.)  His depression was a four on a ten-point scale.  (Id.)  He had had some intermittent suicidal ideation since his last visit, but had not spent any time thinking of a plan.  (Id.)  As long as he stayed home, his hallucinations were less on the Zyprexa.  (Id.)  When he was in public, he was more anxious and paranoid.  (Id.)  On examination, he was alert and oriented to time, place, and person.  (Id. at 412.)  He had a dull

affect, fair eye contact, normal speech, a linear flow of thought, intact memory, and fair insight and judgment. (Id.) His hygiene and grooming were fair, casual, and appropriate. (Id.) He did not have any suicidal or homicidal ideation and reported intermittent auditory and visual hallucinations. (Id.) His prescription for Zyprexa was renewed; his prescription for Celexa was restarted. (Id.)

Also before the ALJ were assessments by examining and nonexamining consultants of Plaintiff's mental abilities and limitations.

In November 2011, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Mark Altomari, Ph.D. (Id. at 369-80.) Plaintiff was described as having schizophrenia, a mood disorder, and a polysubstance abuse disorder. (Id. at 369, 371, 371, 375.) These disorders resulted in Plaintiff experiencing moderate difficulties in social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 377.) He did not have any restrictions in his activities of daily living. (Id.) Nor had he had any repeated episodes of decompensation of extended duration. (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. Altomari assessed Plaintiff as not being significantly limited in two of the three abilities in the area of understanding and memory and moderately limited in his ability to understand and remember detailed instructions. (Id. at 366.) In the area of sustained concentration and persistence, Plaintiff was moderately limited in four of the eight listed abilities: his abilities to (1) carry out detailed instructions; (2) maintain concentration and attention for extended periods; (3)

work in coordination with or proximity to others without being distracted by them; and (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 366-67.) He was not significantly limited in the remaining four abilities. (Id.) In the area of social interaction, Plaintiff was moderately limited in all five abilities, including in his ability to accept instructions and respond appropriately to criticism from supervisors.. (Id. at 367.) In the area of adaptation, Plaintiff was not significantly limited in three of the four listed abilities and was moderately limited in one: his ability to respond appropriately to changes in the work setting. (Id.)

Plaintiff submitted a Drug and Alcohol Use Questionnaire he answered in May 2012. (Id. at 400-02.) He had started to drink or use drugs when he was fourteen years old. (Id. at 400.) He no longer did either. (Id.) He had not received treatment for alcohol or drug problems in the past five years. (Id.)

At his attorney's request, Plaintiff was evaluated in July 2012 by Melissa Hutchens, M.D., a board-certified psychiatrist. (Id. at 414-23.) Plaintiff reported he was taking Zyprexa on a regular basis but was not taking his other two prescribed medications because he could not afford them. (Id. at 415.) The medications lessened the frequency of his symptoms, but did not eliminate them. (Id.) He constantly heard voices and heard the devil talking to him when he was out in public. (Id.) He has been hearing the devil since he was ten or twelve years old. (Id.) He sees shadows in the corners of his eyes; in the past, he saw shadows of figures across the room. (Id. at 416.) He constantly checks the windows at his

house because he is afraid someone is trying to hurt him or his family.  (Id.)  In the past few months, half his days have been good and half have been bad.  (Id.)  With the birth of his son ten days earlier, more days have been good than bad.  (Id.)  Plaintiff further reported having been diagnosed with ADHD when he was approximately fifteen years old.  (Id. at 417.) Plaintiff smoked one-pack of cigarettes a day; it was the only drug he had been unable to stop.  (Id. at 418-19.)  He had started drinking alcohol and using drugs when he was thirteen or fourteen.  (Id. at 419.)  He had stopped drinking alcohol and using heroin and prescription pills when he was fourteen; he had stopped using methamphetamine when he was seventeen; and he had stopped using marijuana in February 2012.  (Id.)

On examination, Plaintiff had good hygiene and was casually dressed.  (Id. at 420.) He had a normal gait.  (Id.)  He was cooperative and polite, but had minimal eye contact. (Id.)  Noises distracted him.  (Id.)  His speech was quiet, but normal in rate and cadence. (Id.)  He was anxious, and his affect was appropriate and congruent with anxiety.  (Id.)  He reported having auditory and visual hallucinations.  (Id.)  His thought process was organized, but his thought content included symptoms of paranoia, reports of receiving messages from the devil, and reports of having special powers of fighting and shooting guns  (Id.)  He did not appear to present any threat of imminent harm to others.  (Id.)  He had no current suicidal ideation.  (Id.)  He appeared to be of below average to average intelligence.  (Id.)  This assessment was not based on any intelligence testing but on his lack of a high school diploma and his "mildly limited" vocabulary and spelling.  (Id.)  His insight and judgment were poor, although they were improving as demonstrated by his compliance with medication and

treatment and his stopping using drugs.  (Id. at 420-21.)  Dr. Hutchens concluded that Plaintiff's diagnosis of paranoid schizophrenia was supported by the evidence of auditory hallucinations and of delusions the devil was speaking to him, both of which preceded any substance abuse and continued once the abuse had stopped.  (Id. at 421.)  She opined that he fit the criteria for post-traumatic stress disorder (PTSD) because of the significant trauma he had experienced as a child.  (Id.)  He also fit the criteria for panic disorder with agoraphobia.  (Id.)  "His judgment is poor overall and is only worse in an environment where he does not have control."  (Id. at 422.)  He could not interact with supervisors or with people with any authority.  (Id.)  He could not relate to co-workers and could not deal with the public.  (Id.)  His hallucinations would cause him to be unable to sustain concentration and attention when outside the house, as was evidenced by the interview.  (Id.)  It was unlikely he could maintain adequate hygiene in a full-time job.  (Id.)  He could not behave in a emotionally stable manner or maintain reliable hours.  (Id.)  Dr. Hutchens noted that it was not uncommon for someone to continue smoking cigarettes after quitting illicit drug use and that Zyprexa was known to cause side effects relieved by nicotine.  (Id.)  She diagnosed him with schizophrenia, paranoid type; panic disorder with agoraphobia; PTSD; cannabis dependence in remission; and history of polysubstance dependence in sustained remission.  (Id. at 423.)  His current GAF was 40.  (Id.)

The next month, Dr. Hutchens completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on Plaintiff's behalf.  (Id. at 425-26.)  Of the eight abilities listed for the category of "Making Occupational Adjustment," Plaintiff had a fair

ability in one, i.e., following work rules, and a poor or no ability in the remaining seven.  (<u>Id.</u> at 425.)  In the three abilities listed for the category of "Making Performance Adjustments," Plaintiff had a fair ability in one, i.e., understanding, remembering, and carrying out simple job instructions, and a poor or no ability in the remaining two.  (<u>Id.</u> at 426.)  Dr. Hutchens opined that Plaintiff "might be able to learn a 'simple job' but he would have to work in <u>complete</u> isolation; even in this impossible scenario his ability to have the motivation or organization to do this regularly is highly unlikely."  (<u>Id.</u>)  In the four abilities listed for the category of "Making Personal-Social Adjustments," Plaintiff had a fair ability in one, i.e., maintaining personal appearance, and a poor or no ability in the remaining three.  (<u>Id.</u>)

## The ALJ's Decision

The ALJ first determined Plaintiff met the insured status requirements of the Act through September 30, 201, and had not engaged in substantial gainful activity after his alleged disability onset date of October 27, 2010.  (<u>Id.</u> at 10.)  He next determined that Plaintiff had severe impairments of schizophrenia and polysubstance dependence.  (<u>Id.</u>)  His COPD had not been established by any acceptable medical source or by an objective medical evidence.  (<u>Id.</u> at 11.)  Moreover, even if COPD had been medically determinable, it would not be severe based on the lack of any documentation of a resulting functional limitation.  (<u>Id.</u>)  Plaintiff's impairments did not, singly or combined, meet or medically equal an impairment of listing-level severity.  (<u>Id.</u>)  He had only mild restrictions in his activities of daily living.  (<u>Id.</u>)  He had moderate difficulties in social functioning.  (<u>Id.</u>)  He had some friends with whom he spent time and had helped a friend tear the roof off a house.  (<u>Id.</u>)  He

was "for the most part, capable of interacting independently, appropriately, effectively, and on a sustained basis." (Id. at 11-12.) He did have some limitations in interacting with co-workers and supervisors. (Id. at 12.) Plaintiff also had moderate difficulties in concentration, persistence, or pace. (Id.) He could drive a car, play video games, mow the lawn, watch television, listen to music, pay bills, count change, and use a checkbook or money orders. (Id.) He had not had any episodes of decompensation of extended duration. (Id.) Although he was once hospitalized, it was not for an extended time. (Id.)

The ALJ then determined that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with limitations of being able to understand, remember, and carry out simple instructions; having only occasional interaction with co-workers and supervisors and no more than incidental interaction with the general public; and needing to be introduced gradually to changes in the work setting. (Id. at 13.) He could "maintain adequate attendance and sustain an ordinary routine without special supervision[.]" (Id.) Addressing Plaintiff's allegations of getting stressed out, hearing voices, seeing things that are not there, and not being able to go out in a group of more than three people without having a panic attack, the ALJ found those allegations to be inconsistent with Plaintiff's report he could do such things as take care of his personal care needs, do house cleaning, take care of pets, shop for groceries, drive a car, watch television, listen to music, and play video games. (Id. at 13-14.) Although Plaintiff's wife reported he had difficulties getting along with others and understanding, she also reported he spent time with others, shopped, played on the computer, went places, took care of pets, and had no trouble with his

personal care needs. (Id. at 14.) The ALJ concluded that Plaintiff's testimony was not credible insofar as he failed to take his prescribed medication even though he admitted it helped his mood. (Id. at 15.) Although Plaintiff testified and also informed his medical providers that he could not afford the medication, he continued to smoke and, after the alleged disability onset date, was able to afford illegal substances, including marijuana. (Id.)

The ALJ discounted Dr. Hutchens' conclusions based on (1) inconsistencies he found between her opinion Plaintiff was unable to interact with anyone in authority, to deal with stress, to work independently, or to sustain concentration and attention and her opinion he could learn a simple job and work if completely isolated from others; (2) her apparent reliance on his reported symptoms and not on her own observations; and (3) inconsistencies between Plaintiff's treatment records showing he was refusing any mental health treatment other than medication and the need for more treatment if his limitations were as described. (Id. at 16.)

The ALJ also gave little weight to Plaintiff's GAF scores. (Id. at 16-17.)

He did, however, give significant weight to Dr. Altomari's assessment of Plaintiff's mental limitations. (Id. at 17.) Acknowledging that the assessment was to be weighed as from a non-examining source, the ALJ found it to be supported the record, including the medical evidence and Plaintiff's allegations. (Id.) The ALJ further found that additional medical evidence received after Dr. Altomari made his assessment supported more restrictive limitations. (Id.)

With his RFC, Plaintiff could not perform his past relevant work. (Id.) With his age, limited education, and RFC, he could perform other jobs existing in significant numbers in the national economy. (Id. at 18.) He was not, therefore, disabled within the meaning of the Act. (Id. at 19.) Because he was not disabled, it was necessary to reach the question wether his use of drugs and alcohol was material. (Id. at 17.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)). "Each step in the disability determination entails a separate

analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description

of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u>

**Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from

that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'"  **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>, 421 F.3d at 789).

## <u>Discussion</u>

Plaintiff argues that the ALJ erred when assessing his RFC and evaluating his credibility.  The Commissioner disagrees.

The ALJ found that, although Plaintiff has some limitations in interacting with co-workers and supervisors, he is "for the most part, capable of interacting independently, appropriately, effectively, and on a sustained basis."  (R. at 11-12.)  Plaintiff has the RFC to perform a full range of work at all exertional levels with limitations of, among other things, having only occasional interaction with co-workers and supervisors and no more than incidental interaction with the general public.  (<u>Id.</u> at 13.)  He can "maintain adequate attendance and sustain an ordinary routine without special supervision[.]"  (<u>Id.</u>)

As explained below, the ALJ's findings misstate the record on Plaintiff's abilities to function and overstate his failure to comply with recommended medical treatment.  These errors led to an erroneous assessment of Dr. Hutchens' evaluation.

First, the ALJ found that Plaintiff's ability to take care of his personal needs and his pets, to play video games and on the computer, to spend time with others, to shop, to drive a car, and to watch television or listen to music were inconsistent with his allegations of disabling panic attacks. With the exception of spending time with others and shopping, all the cited activities are of isolated pursuits. The record is replete with evidence that Plaintiff is generally okay when at home. If he leaves his house, he goes for a short walk by himself, goes fishing by himself, or is with his wife. The Burrell community support specialist visited him at his house and accompanied him to his doctor's appointment. The abilities to feed, water, and occasionally bathe his pets and to take care of his personal needs are not inconsistent with his allegations of crippling feelings of isolation. "[I]t is well-settled law that a claimant need not prove [he] is bedridden or completely helpless to be found disabled." **Reed v. Barnhart**, 399 F.3d 917, 923 (8th Cir. 2005) (internal quotations omitted). In that case, the Eighth Circuit found the claimant's ability to go grocery shopping if forced, if with her mother-in-law, and if the trip was short was not inconsistent with her claim of disabling mental impairments. **Id.** See also **Conklin v. Astrue**, 360 Fed. App'x 704, 706 (8th Cir. 2010) (per curiam) (finding ALJ had erred in discounting subjective complaints of claimant alleging she withdrew from, and was uncomfortable around others; ALJ had improperly weighed claimant's abilities to care for her personal needs, do some housework, and attend small class at church); **Burnside v. Apfel**, 223 F.3d at 840, 845 (8th Cir. 2000) (finding ALJ had erred in concluding claimant's daily activities, including feeding and checking on children's pets, occasionally cooking, driving, grocery shopping, and running errands, were

inconsistent with complaints of limiting nonexertional impairments).  But cf. **Brown v. Astrue**, 611 F.3d 941, 955-56 (8th Cir. 2010) (affirming ALJ's decision finding claimant's daily activities were inconsistent with her allegations of disabling mental impairments – her activities included getting daughter off to school, being involved in her daughter's school activities, cleaning, preparing three meals a week, going to a workout center three times a week, going to church every week and sometimes to Bible class, driving, doing laundry, and paying bills); **Pirtle v. Astrue**, 479 F.3d 931, 935 (8th Cir. 2007) (affirming ALJ's credibility decision based, in part, on claimant's daily activities of driving a manual-transmission car, shopping, performing housework, fishing, attending church two or three times a week, caring for personal needs, and home-schooling her two children).

The evidence of Plaintiff spending time with others is also not inconsistent with his allegations.  With the exception of the one reference to helping a friend tear off a roof,[14] the time he spends with friends is when they visit him at his house.  The restricted location of this social interaction explains the apparent inconsistency the ALJ found between Plaintiff's wife's report he had difficulties getting along with others and also that he spent time with others. And, the evidence relating to Plaintiff shopping is that he does not like to do so because he has panic attacks in stores.

The ALJ also concluded that Plaintiff's failure to comply with recommended treatment detracted from his credibility.  This is a proper consideration, see **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010), when it is supported by the record.  In the instant case, it is not.

---

[14]The Court notes Plaintiff was once a self-employed roofer.

Although it is undisputed that Plaintiff failed to comply with Burrell's community support specialist's recommendation that he go with her into the community and was, consequently, discharged from that portion of the treatment program, the failure is consistent with Plaintiff's subjective complaints of not being able to be with other people without panicking. Plaintiff continued to see the Burrell psychiatrist and to take the prescribed Zyprexa. It is also undisputed that he did not take the prescribed Celexa or Ativan. His explanation was he could not afford the two medications. The ALJ noted that such an explanation may be unavailing given that Plaintiff continued to smoke cigarettes, see **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (ALJ properly considered claimant's continuing to smoke three packs of cigarettes a day when rejecting his claim that he could not afford prescribed pain medication), but did not address Dr. Hutchens' report that it was not uncommon for people to continue to smoke cigarettes after stopping the use of illegal drugs and that nicotine helped relieve side effects caused by Zyprexa. The ALJ further rejected the explanation on the grounds Plaintiff continued to use illegal drugs after his alleged disability onset date. It is undisputed that Plaintiff did so. It is also undisputed that he was first prescribed Celexa and Ativan in December 2011, stopped using illegal drugs in February 2012, was compliant with his medications in April 2012, and reported in June he could not afford the Celexa and Ativan. Thus, his former illegal drug use was not the reason he could not afford medication four months later.

## Conclusion

The ALJ's errors in assessing Plaintiff's credibility contributed to his decision to discount the opinion of Dr. Hutchens, who had examined Plaintiff after he stopped using illegal drugs, and to give significant weight to the opinion of Dr. Altomari, a non-examining consultant who rendered that opinion during the time Plaintiff was using illegal drugs. The case should be remanded for a re-evaluation of Plaintiff's credibility and, if necessary, for a consultative examination to further develop the record on whether Plaintiff has a disabling mental impairment. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as discussed above.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of January, 2014.